1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DONALD FULLER,

                        Plaintiff,

        v.

CARYN LEE, et al.,

                        Defendants.

CASE NO. C13-0563JLR

ORDER GRANTING SUMMARY
JUDGMENT

## I.    INTRODUCTION

This matter comes before the court on Defendants' motion for summary judgment.
(*See* Mot. (Dkt. # 37).)  In this motion, Defendants City of Seattle ("City"), Sergeant
Caryn Lee, and Kathryn Olson dispute Plaintiff Donald Fuller's claims that they
unlawfully retaliated against him for filing a complaint with the Seattle Police
Department Office of Professional Authority ("OPA").  Having considered the
submissions of the parties, the balance of the record, and the relevant law, and having
heard oral argument, the court GRANTS Defendants' motion for summary judgment.

## II.   BACKGROUND

Unless otherwise noted, the following facts are undisputed.[1]  On March 6, 2009, two City of Seattle police officers stopped Mr. Fuller for crossing the street against a traffic signal.  (Fuller Decl. (Dkt. # 47) ¶ 2, Ex. D ("Fuller Mot. to Vacate") Ex. 1 ("Police Rep.") at 41, 44.)  Mr. Fuller denies that he was jaywalking.  (Fuller Decl. ¶ 2.)  The officers requested multiple times that Mr. Fuller provide identification so that they could issue him a citation.  (Fuller Decl. Ex. B ("Fuller OPA Stmt."); Police Rep. at 41, 42.)  Mr. Fuller admitted he was carrying identification, but refused to show it to the officers.  (Fuller OPA Stmt.; Police Rep. at 41, 42.)  The situation escalated into a physical confrontation during which Mr. Fuller was tased and handcuffed.  (Fuller Decl. ¶ 2; Fuller OPA Stmt.; Police Rep.)  At some point, Mr. Fuller struck Officer Willoughby near his right eye, cutting the officer's face and breaking his glasses.  (Fuller Decl. ¶ 2; Police Rep. 41, 43.)  Mr. Fuller denies that the contact was intentional.  (Fuller Decl. ¶ 2.)

Five days later, Mr. Fuller went to OPA to file a complaint against the officers.  (*Id*. ¶ 4.)  OPA is the arm of the Seattle Police Department that oversees the intake, classification, investigation, and disposition of complaints regarding Seattle Police

---

[1] As a preliminary matter, the court addresses Defendants' motions to strike.  Defendants move to strike the declaration of D.P. Van Blaricom as improper expert testimony.  (*See* Reply (Dkt. # 49).)  Because the court does not rely on Mr. Blaricom's declaration to adjudicate this motion, the court denies this motion as moot.  Defendants also move to strike the portions of Mr. Fuller's opposition that misrepresent Ms. Olson's deposition testimony.  (*See id*.)  Because the court relies on the text of Ms. Olson's deposition testimony rather than the paraphrasing found in Mr. Fuller's opposition, the court denies this motion as moot.  Finally, Defendants move to strike the portions of Mr.  Fuller's opposition that are over-length.  (*See id*.)  Mr. Fuller's opposition violates this court's Local Rules in that it is less than double-spaced and it exceeds 24 pages.  *See* Local Rule W.D. Wash. LCR 7(e)(1), (3).  In the interests of adjudicating this dispositive motion fully and fairly on its merits, the court declines to strike the over-length portions of Mr. Fuller's brief.  The court cautions that further disregard for the Local Rules may result in sanctions.

1    Department employees.  (*See* Fuller Decl. Ex. 7 ("OPA Website").)  Shortly after filing

2    his complaint, Mr. Fuller received a form letter and brochure describing the OPA process.

3    (*Id.* ¶ 6.; Fuller Decl. Ex. A ("OPA Brochure").)  The brochure stated, among other

4    things:  "The Office of Professional Accountability (OPA) Director . . . is responsible for

5    the management and oversight of the investigative process and ensures the highest

6    standards for documentation, investigation, reporting, and resolution of complaints."

7    (OPA Brochure at 5.)  The brochure also stated:  "Filing a complaint does not affect other

8    civil or criminal proceedings."  (*Id.* at 5.)

9        Sgt. Lee, who was a Sergeant Detective with OPA, was assigned to investigate

10   Mr. Fuller's complaint.  (Lee Decl. (Dkt. # 39) ¶ 6, Ex. A ("Case Summary"), Ex. B

11   ("Follow Up Form").)  As an investigator, her role was to collect the pertinent data

12   regarding a complaint and to pass this information on to a lieutenant, who would make

13   recommendations to the OPA Director regarding the ultimate disposition of a complaint.

14   (*See* Lee Decl. ¶ 4; Stockmeyer Decl. (Dkt. # 46-1) Ex. 2 ("Lee Dep.") at 12:13-14:12.)

15   OPA investigators were not required or expected to make recommendations regarding the

16   disposition of complaints.  (*See* Lee Decl. ¶ 4.)

17       Sgt. Lee began her investigation by speaking with Mr. Fuller on the phone.  (*See*

18   Follow Up Form.)  Sgt. Lee recalls that she instructed Mr. Fuller to submit his statement

19   via email, and that he asked her to recover tape recordings of the incident.  (*See id.*; Lee

20   Dep. at 46:9-47:9.)  In his deposition, Mr. Fuller testified that "I guess she was giving me

21   that little song and dance that, you know, she was there to be helpful to me and, you

22

1   know, just giving me the line that she's there to help me out."  (Christie Decl. Ex. F

2   ("Fuller Dep.") at 84:4-13.)  Mr. Fuller now alleges:

3   > I spoke on the phone with OPA investigator Caryn Lee and she told me she
    > would fairly handle the investigation, and I could count on her to present
4   > my complaints and information fairly, and help get a just result for my
    > complaint; she said what I described sounded like the officers did
5   > something wrong, and 'we really need to know how in detail this
    > happened,' and she asked me to provide more information.

6   (Fuller Decl. ¶ 9.)

7        A few days later, Mr. Fuller submitted two statements to Sgt. Lee.  (Follow Up

8   Form.)  In these statements, he claimed that the officers engaged in racial profiling,

9   detained him without cause, used excessive force against him, and withheld medical

10  treatment.  (*See* Fuller OPA Stmt.; Fuller Decl. Ex. C ("Fuller OPA Add.").)

11       In the meantime, Mr. Fuller's criminal case file had been assigned to Detective

12  Nathan Janes for a charging decision.  (*See* Janes Decl. (Dkt. # 38) ¶ 3.)  After discussing

13  the case with a King County prosecutor, Det. Janes booked Mr. Fuller on misdemeanor

14  assault, obstruction, and resisting arrest charges and submitted the case to the Seattle City

15  Attorney's Office to allow that office to decide whether to file misdemeanor charges in

16  Seattle Municipal Court.[2]  (*See id.* at 5.)  While waiting to receive Mr. Fuller's statement,

17  Sgt. Lee attempted to contact Det. Janes to determine the status of the criminal case and

18  to verify Mr. Fuller's address.  (Follow Up Form.)  Sgt. Lee had noticed that the address

19

20  _____

21  [2] Seattle maintains two parallel court systems for misdemeanor offenses:  the Seattle District
    Court and the Seattle Municipal Court.  (*See* Whalley Decl. (Dkt. # 41) ¶ 3-6.)  The King County
22  Prosecuting Attorneys' policy against prosecuting misdemeanor assault charges in Seattle District Court
    means such charges are filed, if at all, by the Seattle City Attorney in the Seattle Municipal Court.  (*Id.*)

1   listed on Det. Janes' form differed from the address Mr. Fuller had provided in his OPA

2   complaint.  (*Id.*)  Additionally, Sgt. Lee knew that OPA investigations are usually tolled

3   during the pendency of related criminal cases.  (Lee Decl. ¶ 5; Olson Decl. (Dkt. # 40)

4   ¶ 3).)

5          A few days later, Det. Janes had still not responded to her queries, so Sgt. Lee

6   visited his office in the homicide department.  (Follow Up Form; Lee Dep. at 48:24-

7   49:22.)  Det. Janes informed her that he did not know whether the case had been filed or

8   declined; his office had faxed the case to the City Attorney's Office and that was the last

9   he had heard of it.  (Follow Up Form; Lee Dep. at 49:9-50:10.)  The next day, Sgt. Lee

10  submitted Mr. Fuller's incident report to the receptionist at the City Attorney's Office.

11  (Follow Up Form; Lee Dep. at 50:11- 53:19; Stockmeyer Decl. Ex 13 ("Lee Ethics

12  Interview") at 54.)  She states that she did so because "nobody seemed to know where the

13  case physically was.  And because sometimes when paperwork is faxed, sometimes it

14  doesn't get to the exact person you want it to go to."  (Lee Dep. at 51:19-53:2.)

15         About one month later, Sgt. Lee contacted the City Attorney's Office to check on

16  the status of the case and spoke with Suzanne Hatfield.  (*See* Follow Up Form.)  She

17  learned that the case had been declined.  (*Id.*; Lee Dep. at 54:22-55:14.)  When she

18  requested clarification of the filing decision, Ms. Hatfield offered to investigate and

19  return her call.  (Lee Dep. at 54:22-55:14; Lee Ethics Interview at 58.)  A few hours later,

20  Ms. Hatfield copied Sgt. Lee on an email to Rocio Guerro, the City attorney originally

21  staffed on Mr. Fuller's case.  (*See* Fuller Mot. to Vac. Ex. 2 ("Hatfield Email").)  The

22  email stated that the case had been declined for "insufficient evidence" and requested that

1    an attorney contact Sgt. Lee.  (*See id.*; Lee Dep. at 64:2-25; *see also* Stockmeyer Decl.

2    Ex. 10 ("Decline Memo").)  That afternoon, assistant City Attorney Marc Mayo, who

3    was at that time overseeing Mr. Fuller's file, called Sgt. Lee.  (Lee Ethics Interview 58;

4    Follow Up Form; Lee Dep. at 55:16-56:22.)  He told Sgt. Lee that his office was

5    concerned that the officers' initial detention of Mr. Fuller was not legal.  (Follow Up

6    Form; Lee Dep. at 56:5-21.)  Sgt. Lee disagreed that the stop was unlawful, and

7    explained to Mr. Mayo why she thought there was probable cause for the stop.  (*See*

8    Follow Up Form; Lee Dep. at 58:17-19; Lee Ethics Interview at 58.)  By the end of the

9    conversation, Mr. Mayo agreed that the detention was legal, and told Sgt. Lee that his

10   office would file charges for obstruction and possibly assault.  (*See* Lee Dep. at 21:2-22,

11   60:10-22; Follow Up Form.)  A few days later, Mr. Mayo called Sgt. Lee again and

12   informed her briefly that he intended to file obstruction, assault, and resisting arrest

13   charges against Mr. Fuller.  (*See* Follow Up Form; Lee Ethics Interview at 62.)

14        Sgt. Lee testifies that she engaged Mr. Mayo in a conversation regarding probable

15   cause because the legality of the officers' stop had significant implications for the

16   investigation she was conducting regarding the officers' use of force.  (Lee Dep. at 19:2-

17   23:6.)  She claims that she only expressed disagreement with Mr. Mayo's assertion that

18   the officers' initial detention was unlawful, not with Mr. Mayo's decision not to file

19   charges.  (*Id.* at 17:18-19:16; 58:2-11.)

20        Mr. Mayo testifies that he agreed to reconsider the case after he received a call

21   from a sergeant at the Seattle Police Department, whose name he does not recall.

22   (Stockmeyer Decl. Ex. 4 ("Mayo Dep.") at 41:18-42:2; 68:1-5.)  He does not remember

the substance of the conversation other than that he agreed to reconsider the case because, although it "was fileable technically," they "disagreed as to whether it was a great, good case." (*Id.* at 45:4-13.) During reconsideration, he reviewed at least the police incident reports, and more probably than not also reviewed the officers' Certificate of Determination of Probable Cause, which was a type of form his office normally reviewed. (Mayo Dep. at 42:3-8; 43:15-22; 53:5-19; 88:4-23.) Upon reconsideration, he determined first that the case was "fileable" based on the incident reports alone. (*Id.* at 42:9-14, 42:20-43:5.) A "fileable" case, according to Mr. Mayo, is one in which "all the reasonable foreseeable facts and reasonable foreseeable defenses and evidence that would be admitted . . . would lead a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt." (*Id.* at 43:2-5.) Nonetheless, he decided to interview the officer who had been struck to determine exactly what the officer's testimony would be. (*Id.* at 42:9-14; 42:20-43:5.) When interviewing Officer Willoughby, Mr. Mayo asked whether Mr. Fuller's contact could have been accidental. (*Id.* at 75:22-76:4.) Officer Willoughby confirmed that Mr. Fuller "slugged" him on purpose, breaking his glasses. (*Id.* at 75:23-76:14.) Based on this information, Mr. Mayo decided to charge Mr. Fuller with obstruction and assault. (*Id.* at 74:4-21; Fuller Mot. To Vac. Ex. 12 ("Crim. Compl.").)

Mr. Mayo states that he reconsidered the case because he believes it is his "obligation to reconsider when someone asks me to reconsider." (Mayo Dep. at 63:4-11; 73:14-20.) Mr. Mayo was not aware that Sgt. Lee worked for OPA when he talked to her. (*Id.* at 44:25-46:14.) He does not recall whether he was aware that Mr. Fuller had filed a complaint with OPA at the time. (*Id.* at 57:18-22.) He explains that if anyone,

1   whether a victim or an officer, asked his office to take a second look at a case, the case

2   "would almost always be reconsidered."  (*Id.* at 10:19-13:7.)

3          Sgt. Lee sent the results of her OPA investigation to an OPA lieutenant on May

4   28, 2009.  (Lee Ethics Interview at 60.)  The lieutenant recommended exonerating the

5   officers on all claims.  (*See* Olson Decl. Ex. B ("Cert.").)  Ms. Olson, who was the OPA

6   Director at the time, reviewed the completed investigation file.  (Olson Decl. ¶ 4.)  After

7   noticing that OPA had "contact[ed] the Prosecutor's Office with questions regarding

8   charging decisions," she discussed with the OPA Auditor the importance of avoiding the

9   appearance of conflicts of interest.  (Olson Decl. Ex. A ("Olson Email").)  In September,

10  2009, she disseminated a Certification of Completion and OPA Disposition

11  ("Certification") exonerating the officers on all claims and closing Mr. Fuller's OPA

12  case.  (Cert.)  With respect to OPA contact with prosecutors, the Certification advised:

> 13      Though contact is sometimes necessary to gather information relevant to an
>         investigation, care must be taken to avoid even the appearance that OPA-IS
> 14      is attempting to influence a prosecution involving an OPA-IS complainant.
>         After discussion with the OPA Auditor and Captain Gleason, it was agreed
> 15      that at a minimum, where there is a filing recommendation regarding the
>         complainant, the recommendation should be reduced to writing and
> 16      approved through the OPA chain of command.

17  (*Id.*)

18         In June, 2009, Mr. Fuller was officially charged with obstructing a public servant

19  under Revised Code of Washington 9A.76.020 and with assault under Seattle Municipal

20  Code 12A.06.010.  (*See* Crim. Compl.; Christie Decl. (Dkt. # 42) Ex. H ("Municipal

21  Court Dkt.") at 57-58.)  The Municipal Court Judge responsible for reviewing the charges

22  against Mr. Fuller evaluated the incident reports and made an independent determination

1  that there was probable cause to proceed to trial on the charges of obstruction and

2  assault.[3]  (Christie Decl. Ex. H ("Bonner Decl.") ¶ 2.)  After a trial in March, 2010, a jury

3  found Mr. Fuller guilty of obstruction and not guilty of assault.  (*Id.* at 62-63; Christie

4  Decl. Ex. J ("Verdict Form").)  Mr. Fuller appealed.  (Christie Decl. Ex. L ("Appeal").)

5  The King County Superior Court upheld the verdict in January, 2011.  (*Id.*)

6        In September, 2012, after learning of Sgt. Lee's interactions with Mr. Mayo, Mr.

7  Fuller moved to vacate his conviction.  (Fuller Mot. to Vac.)  Shortly thereafter, in

8  October, 2012, the City brought an independent motion to vacate the judgment and to

9  dismiss its complaint against Mr. Fuller.[4]  (Christie Decl. Ex. N. ("City Mot. Vac.").)  In

10  its motion, the City maintained that Mr. Fuller was guilty of obstructing an officer and

11  denied that he had been charged because he filed a complaint with OPA.  (*Id.* at 112.)

12  The City nevertheless requested that the court vacate the conviction because:

13        [T]he circumstances of this situation might deter other citizens from
      engaging or participating in the OPA complaint process.  The government
14        should not prosecute a person for the purpose of deterring him from
      exercising his right to protect official misconduct.  Avoiding this potential
15        "chilling effect" is the reason . . . justifying vacation of the judgment.

16  (*Id.*)  Accordingly, the Seattle Municipal Court vacated Mr. Fuller's conviction and

17  entered a judgment of dismissal.  (Christie Decl. Ex. O ("Vac. Order").)

18  _____

19     [3] Charging decisions for cases tried in Seattle Municipal Court are typically reviewed for
20  probable cause by a Municipal Court Judge before the case proceeds to trial.  (Christie Decl. Ex. H
   ("Bonner Decl.") ¶ 2.)

21     [4] In addition, City Attorney Pete Holmes issued a press release denying that any prosecutorial
   misconduct had occurred and explaining his reasons for requesting that the conviction be vacated. (*See*
22  Stockmeyer Decl. Ex. 12 ("Holmes Release").  Specifically, he stated:  "I am taking this action because it
   is crucial that the public have full faith and confidence in both OPA and the criminal justice system."

1   After his conviction was vacated, Mr. Fuller filed this suit. (*See* Not. of Rem. (Dkt.

2   # 1) Ex. A ("Compl.") ¶ 54.)  In this suit, Mr. Fuller does not assert any claims against

3   the officers who arrested him, any claims arising from the arrest itself, or any claims

4   against the prosecutors.  (*See id.*)  Rather, he brings (1) 42 U.S.C. § 1983 claims for

5   violations of the First and Fourteenth Amendments against Ms. Olson and Sgt. Lee; (2) a

6   42 U.S.C. § 1983 claim against the City under *Monell v. Department of Social Services of*

7   *City of New York*, 436 U.S. 658, 690 (1978); (3) a malicious prosecution claim against

8   Sgt. Lee and the City; (4) an intentional infliction of emotional distress claim against Sgt.

9   Lee and the City; and (5) a negligence claim against the City.  (*See generally* Compl.)

10  Defendants have moved for summary judgment on all claims.  (*See generally* Mot.)

11  Defendants' motion is now before the court.

### III.   ANALYSIS

**A.    Summary Judgment Standard**

14   Federal Rule of Civil Procedure 56 permits a court to grant summary judgment

15  where the moving party demonstrates (1) the absence of a genuine issue of material fact

16  and (2) entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S.

17  317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The

18  moving party bears the initial burden of showing the absence of a genuine issue of

19  material fact.  *Celotex*, 477 U.S. at 323.

20   If the moving party does not bear the ultimate burden of persuasion at trial, it can

21  show the absence of a genuine issue of material fact in two ways:  (1) by producing

22  evidence negating an essential element of the nonmoving party's case, or (2) by showing

1  that the nonmoving party lacks evidence of an essential element of its claim or defense.

2  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir.

3  2000).  The burden then shifts to the nonmoving party to identify specific facts from

4  which a factfinder could reasonably find in the nonmoving party's favor.  *Celotex*, 477

5  U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

6        In determining whether the factfinder could reasonably find in the nonmoving

7  party's favor, "the court must draw all reasonable inferences in favor of the nonmoving

8  party, and it may not make credibility determinations or weigh the evidence."  *Reeves v.*

9  *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  However, a jury "is

10  permitted to draw only those inferences of which the evidence is reasonably susceptible;

11  it may not resort to speculation."  *British Airways Bd. v. Boeing Co.*, 585 F.3d 946, 952

12  (9th Cir. 1978).  If the nonmoving party fails to produce enough evidence to create a

13  genuine issue of material fact, summary judgment for the moving party is proper.  *Nissan*

14  *Fire*, 210 F.3d at 1106.

15  **B.**  **First Amendment:  Retaliatory Prosecution**

16        In order to establish a claim for retaliation in violation of the First Amendment a

17  plaintiff must show:  (1) municipal officials took action that would chill or silence a

18  person of ordinary firmness from future First Amendment activities, and (2) the officials'

19  desire to chill the plaintiff's speech was the but-for cause of their action.  *Skoog v. Cnty.*

20  *of Clackamas,* 469 F.3d 1221, 1231-32 (9th Cir. 2006).  In the subcategory of retaliatory

21  prosecution claims, but-for causation is established by "a retaliatory motive on the part of

22  an official urging prosecution combined with the absence of probable cause supporting

1   the prosecutor's decision to go forward." *Hartman v. Moore*, 547 U.S. 250, 265 (2006).

2   As such, the absence of probable cause to prosecute is an element of the prima facie case

3   that must be pleaded and proved by the plaintiff. *Id.*; *see also Beck v. City of Upland*,

4   527 F.3d 853, 865 (9th Cir. 2008).  Where the material facts are undisputed, the existence

5   of probable cause is a question of law.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128,

6   1146 (9th Cir. 2012); *Peng v. Mei Chin Penghu*, 335 F.3d 970, 979-80 (9th Cir. 2003)

7   (same).

8          Here, Mr. Fuller fails to show an absence of probable cause.  As such, the court

9   need not reach the remaining elements of his retaliatory prosecution claim.  The parties

10  disagree about the preclusive effect of Mr. Fuller's prosecution in state court on the

11  court's determination of probable cause.  (*Compare* Mot. *with* Resp. (Dkt. # 45).)  The

12  court declines to decide that issue because Mr. Fuller is unable to show a lack of probable

13  cause regardless of whether the previous conviction is taken into account.  Because Mr.

14  Fuller was convicted of obstruction but acquitted of assault, the court addresses each

15  charge (along with the parties' relevant preclusion arguments) separately below.

16      **1.  Obstruction charge**

17         Federal courts look to state law to determine the preclusive effect of a state court

18  judgment.  *Coeur D'Alene Tribe of Id. v. Hammond*, 384 F.3d 674, 688 (9th Cir. 2004)

19  ("We give to a state-court judgment the same preclusive effect as would be given that

20  judgment under the law of the State in which the judgment was rendered."); *see also*

21  *Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1230 (9th Cir. 2006).  The Washington

22  Supreme Court has held that "[t]he conviction of an accused conclusively establishes the

1  existence of probable cause." *Hanson v. City of Snohomish*, 852 P.2d 295, 297 (Wash.

2  1993).  Even a conviction that is "later reversed" remains "conclusive evidence" of

3  probable cause, unless that conviction was obtained by fraud, perjury, or other corrupt

4  means, or the ground for reversal was the absence of probable cause.  *Id.*  "As a result of

5  *Hanson,* any civil claim, depending in part on the lack of probable cause, is barred by a

6  prior conviction unless an exception applies."  *Fondren v. Klickitat Cnty.*, 905 P.2d 928,

7  934 (Wash. Ct. App. 1995); *see also Gausvik v. Perez*, 239 F. Supp. 2d 1067, 1083-84

8  (E.D. Wash. 2002) *rev'd in unrelated part*, 345 F.3d 813 (9th Cir. 2003) (applying

9  *Hanson*).  Mr. Fuller puts forth no evidence showing that his conviction for obstruction

10 was obtained as a result of fraud or perjury.  Accordingly, under *Hanson*, Mr. Fuller's

11 conviction for obstruction is conclusive proof of probable cause to prosecute.[5]

12       Mr. Fuller argues that *Hanson* is inapplicable because his conviction was vacated.

13 (*See* Resp.)  The Washington Supreme Court has stated that, in general, a vacated

14 judgment loses its preclusive effect.  *Sutton v. Hirvonen*, 775 P.2d 448, 452 (Wash.

15 1989); *see also Matter of Marriage of Leslie*, 772 P.2d 1013, 1016-17 (Wash. 1989).  Mr.

16 Fuller, however, provides no authority addressing the interaction of this general rule with

17 the more specific rule set forth in *Hanson*.  After all, a judgment that is reversed typically

18 will not have any preclusive effect, either.  *See, e.g.*, *State v. Harrison*, 61 P.3d 1104,

19 1110 (Wash. 2003) (holding that collateral estoppel did not apply because an appellate

---

20

21 [5] The Ninth Circuit has upheld district court holdings that a conviction by a jury trial, even if later reversed, conclusively establishes probable cause to prosecute.  *See Gowin v. Altmiller*, 663 F.2d 820, 823 (9th Cir. 1981); *Bergstralh v. Lowe*, 504 F.2d 1276, 1277-78 (9th Cir. 1974); *see generally Wright v.*

22 *Pierce Cnty.*, No. C11-5154 BHS, 2013 WL 4522463, at *6 (W.D. Wash. Aug. 27, 2013).

1   holding reversing and remanding a criminal sentence destroyed the finality of the earlier

2   criminal case); *Mattson v. Am. Petroleum Envtl. Servs., Inc.*, 181 Wash. App. 1035, at *8

3   (2014);[6] *see generally* 14A Wash. Prac., Civil Procedure § 35:23 (2d ed.).  Yet, *Hanson*

4   holds that even reversed convictions conclusively establish probable cause, unless an

5   exception is met.  *See Hanson*, 852 P.2d at 297; *see also Harrison*, 61 P.3d at 1110

6   (stating that, when a criminal sentence is reversed and remanded, the terms "'reverse' and

7   'vacate' have the same definition and effect in this context—the finality of the judgment

8   is destroyed").  This apparent discrepancy may be due to the "distinction between a

9   finding of probable cause and a finding of guilt" that the Washington Supreme Court

10  relied on in *Hanson.  See Hanson*, 852 P.2d at 299 ("The issue here is not whether

11  Hanson was guilty or innocent, it is whether the police and the City of Snohomish had

12  probable cause to prosecute. The fact that a jury found Hanson guilty beyond a

13  reasonable doubt established the existence of probable cause.")  At any rate, the court

14  need not resolve this potential conflict in Washington state law in order to rule on Mr.

15  Fuller's claim.

16          The record shows that, based on the evidence available to him at the time, Mr.

17  Mayo had probable cause to file obstruction charges against Mr. Fuller.  Under

18  Washington state law "[a] person is guilty of obstructing a law enforcement officer if the

19  person willfully hinders, delays, or obstructs any law enforcement officer in the discharge

20

21  _____

6 Federal courts "may consider unpublished state decisions, even though such opinions have no precedential value."  *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 (9th Cir. 2003).

1   of his or her official powers or duties." RCW 9A.76.020.  Police officers in general act

2   under statutory authority to enforce the state traffic and criminal laws.  *See* RCW

3   10.93.070 (providing that ". . . a general authority Washington peace officer . . . may

4   enforce the traffic or criminal laws of this state throughout the territorial bounds of this

5   state"); *McKinney v. City of Tukwila*, 13 P.3d 631, 641 (Wash. Ct. App. 2000).

6       The police reports that Mr. Mayo reviewed state that the officers repeatedly asked

7   Mr. Fuller to provide his identification so that they could issue him a jaywalking citation,

8   but Mr. Fuller refused.  (*See* Police Rep. at 41, 42, 44 (Certification for Determination of

9   Probable Cause); Mayo Dep. at 42:3-8; 43:15-22; *see also* Fuller OPA Stmt.)  The police

10  reports also state that Mr. Fuller physically resisted the officers by first slapping Officer

11  Johnson's hands away and then striking Officer Willoughby in the face, drawing blood.

12  (*See* Police Rep. at 41, 42, 44.)

13      Washington courts have found that a mere refusal to identify oneself to a police

14  officer, without more, does not constitute obstruction.  *See State v. Steen*, 265 P.3d 901,

15  907 (Wash. Ct. App. 2011), *as amended* (Dec. 20, 2011); *State v. Veilleux*, 180 Wash.

16  App. 1034, at *1 (2014).  Rather, obstruction occurs when a person engages in

17  affirmative conduct, such as, for example, disobeying officers' orders or physically

18  resisting officers.  *State v. Williams*, 251 P.3d 877, 884 (Wash. 2011); *see e.g.*, *Veilleux*,

19  180 Wash. App. 1034, at *1 (upholding conviction of obstruction where defendant, after

20  refusing to give his name, physically resisted being fingerprinted); *Steen*, 265 P.3d at 908

21  (upholding conviction of obstruction where defendant refused to open door to the police);

22  *State v. Oster*, 167 Wash. App. 1023, at *4 (2012) (finding probable cause to arrest a

1   women for obstruction where the woman denied owning a purse that contained drug

2   paraphernalia, then wrested the purse away from the officer who had found it, attempted

3   to evade the officer, and resisted his attempts to recover the purse).

4           Because the police reports show Mr. Fuller physically resisted two police officers

5   attempting to issue him a citation for jaywalking, these reports provide probable cause to

6   charge Mr. Fuller with willfully hindering or delaying the officers in discharging their

7   official duty to enforce traffic laws.[7]  *See* RCW 9A.76.020; *see also Lassiter v. City of*

8   *Bremerton*, 556 F.3d 1049, 1054 (9th Cir. 2009) (finding probable cause to prosecute

9   where prosecutor relied on facts recited in Washington State Patrol police reports); *Smith*

10  *v. Almada*, 640 F.3d 931, 938 (9th Cir. 2011) (finding probable cause because there was

11  sufficient evidence in the police report linking the alleged arsonist to the fire in question).

12  As such, whether or not Mr. Fuller's conviction for obstruction is relied upon, Mr. Fuller

13  has failed to show there was not probable cause to charge him with obstruction.  *See*

14  *Tsao*, 698 F.3d at 1146.

15      **2.  Assault charge**

16          Over fifty years ago, the Washington Supreme Court held that an acquittal

17  establishes a prima facie case of want of probable cause to prosecute.  *Peasley v. Puget*

18  *Sound Tug & Barge Co.*, 125 P.2d 681, 688 (Wash. 1942).  Although the Washington

19  Supreme Court has since recognized that this rule conflicts with the majority view that an

20  _____

21      [7] Mr. Fuller's contention that his arrest was unlawful is of little use in this context.  In
    Washington, arrestees are permitted to forcefully resist even an unlawful arrest only if they face actual
    "imminent danger of serious injury or death"—neither of which confronted Mr. Fuller.  *State v. Bradley*,

22  10 P.3d 358, 361 (Wash. 2000).

1    acquittal is not evidence of lack of probable cause, it has yet to explicitly overrule

2    *Peasley*.  *See Hanson*, 852 P.2d at 299 ("Whether we would continue to adhere to the rule

3    as stated in *Peasley* or would adopt the majority view set forth in the [Restatement] is not

4    before us in the present case and we do not reach that issue.")  Moreover, since then,

5    Washington state courts and federal courts applying Washington state law have followed

6    *Peasley*.  *See, e.g.¸ Banks v. Nordstrom, Inc.*, 787 P.2d 953, 958-59 (Wash. Ct. App.

7    1990); *Bassani v. Grant Cnty.*, 115 Wash. App. 1034 (Wash. Ct. App. 2003); *Safouane v.*

8    *Fleck*, 226 F. App'x 753, 765 (9th Cir. 2007), *as amended on denial of reh'g and reh'g*

9    *en banc* (July 26, 2007).  As such, under *Peasely*, Mr. Fuller's acquittal on the assault

10   charge establishes a prima facie case of a lack of probable cause.

11            The applicability of *Peasely*, however, is questionable for two reasons.  First, as

12   discussed above, the fact that the verdict was vacated casts doubt on its preclusive effect.

13   *See* Section III.B.1.  Second, the Ninth Circuit has held that although *Peasley* is

14   applicable to Washington state law claims brought in federal court, it is not applicable to

15   malicious prosecution claims brought under Section 1983 because it conflicts with the

16   federal presumption that the prosecutor exercised independent judgment regarding

17   probable cause.  *See Safouane*, 226 F. App'x at 765; *see also Freeman v. City of Santa*

18   *Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995) ("[T]he mere fact a prosecution was

19   unsuccessful does not mean it was not supported by probable cause.").  This same

20   presumption animates the requirement for proof of a lack of probable cause in federal

21   retaliatory prosecution claims under Section 1983.  *See Hartman*, 547 U.S. at 263.

22

ORDER- 17

1    Once again, the court need not resolve the potential conflict in Washington state

2    law, or the potential conflict between federal and state law, in order to rule on Mr.

3    Fuller's claim.  Under *Peasely*, acquittal establishes only a prima facie case of lack of

4    probable cause.  *Peasley*, 125 P.2d at 688.  The defendant can rebut this case by a

5    showing of evidence; if the case is rebutted, the burden shifts back to the plaintiff to

6    establish want of probable cause by affirmative evidence.  *Id.*  Here, the evidence

7    available to Mr. Mayo is sufficient both to establish probable cause to prosecute and to

8    rebut *Peasley*'s prima facie case of no probable cause, if applicable.

9    Specifically, under the Seattle Municipal Code, "[a] person is guilty of assault

10   when he or she intentionally assaults another person."  SMC 12A.06.010**.**  The police

11   reports that Mr. Mayo reviewed state that Mr. Fuller struck Officer Willoughby near his

12   right eye, cutting the officer's face and breaking his glasses.  (Police Rep. 41, 43.)  Mr.

13   Fuller does not dispute that he struck Officer Willoughby.  (*See* Fuller Decl. ¶ 2.)  The

14   Certification for Determination of Probable Cause corroborates that Mr. Fuller struck

15   Officer Willoughby's face with his fist.  (Police Rep. at 44.)  In addition, when Mr. Mayo

16   interviewed Officer Willoughby to ascertain the facts that he would testify to, Officer

17   Willoughby stated that Mr. Fuller "slugged" him on purpose.  (Mayo Dep. at 75:23-

18   76:14.)  This evidence provides probable cause to charge Mr. Fuller with obstruction.

19   *See, e.g.*, *Lassiter*, 556 F.3d at 1054; *Dietrich*, 548 F.3d at 901; *Almada*, 640 F.3dat 938.

20   Mr. Fuller fails to provide affirmative evidence to establish, or raise a genuine

21   issue of material fact regarding, a lack of probable cause.  Mr. Fuller disputes that his

22   contact with Officer Willoughby's face was intentional (Fuller Decl. ¶ 2), but "a

1  plaintiff's account of the incident in question, by itself, does not overcome the

2  presumption of independent judgment." *Newman v. Cnty. of Orange*, 457 F.3d 991, 994-

3  95 (9th Cir. 2006).  This is because the question is "not whether the prosecutor, in the

4  face of conflicting accounts, would have filed charges based on the *plaintiff's* story, but

5  whether she would have done so based on the *officer's.*" *Id.* The only other evidence in

6  Mr. Fuller's favor is the fact that the City Attorneys Office initially declined to charge

7  Mr. Fuller for assault.  (*See* Decline Memo.)  This decision, however, occurred before

8  Mr. Mayo had the benefit of Officer Willoughby's testimony regarding intent.  (*See*

9  Mayo Dep. At 42:9-14; 42:20-43:5; 74:4-21; 75:23-76:14.)  Moreover, the presiding

10 Municipal Court Judge independently found that the record established probable cause to

11 charge Mr. Fuller with assault.  (*See* Bonner Decl.)  As such, Mr. Fuller has failed to

12 carry his burden to show a lack of probable cause to charge him for assault.

13      Because Mr. Fuller is unable to show lack of probable cause for his prosecution on

14 either the assault or obstruction charge, Mr. Fuller's Section 1983 claim for retaliatory

15 prosecution necessarily fails.  *See Hartman*, 547 U.S. at 265; *Beck*, 527 F.3d at 865.

16 **C.    Fourteenth Amendment:  Due Process**

17      Although Mr. Fuller raises due process claims in his complaint, his opposition to

18 Defendants' summary judgment motion fails to even address—let alone provide evidence

19 supporting—these claims.  (*See* Resp.)  To the extent Mr. Fuller asserts a substantive due

20 process claim, that claim is not viable because it is redundant to his retaliatory

21 prosecution claim under the First Amendment.  Where a particular Amendment "provides

22 an explicit textual source of constitutional protection" against a particular sort of

1  government behavior, "that Amendment, not the more generalized notion of 'substantive

2  due process,' must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S.

3  266, 273 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 395 (U.S. 1989)); *see also*

4  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1069 (9th Cir. 2004) ("The principle that

5  *Albright* establishes is that no substantive due process right exists under the Fourteenth

6  Amendment to be free from prosecution without probable cause.")

7      To the extent Mr. Fuller asserts a procedural due process claim, he fails to present

8  any evidence showing either of the two elements that comprise a procedural due process

9  claim: "(1) a deprivation of a constitutionally protected liberty or property interest, and

10  (2) a denial of adequate procedural protections." *See Brewster v. Bd. of Educ. of*

11  *Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998).  Consequently, this claim

12  is also not viable.  Accordingly, summary judgment on Mr. Fuller's due process claim in

13  favor of Defendants is appropriate.  *See Nissan Fire*, 210 F.3d at 1106.

14  **D.**   ***Monell* Claim**

15      "[A] municipality cannot be held liable under § 1983 on a *respondeat superior*

16  theory." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978).

17  Instead, the City of Seattle may be liable for its employees' allegedly unconstitutional

18  conduct only if Mr. Fuller demonstrates an injury resulting from the "execution of a

19  government's policy or custom." *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900

20  (9th Cir. 2008).  To establish a Section 1983 claim under *Monell*, Mr. Fuller must prove:

21  (1) that he possessed a constitutional right of which he was deprived; (2) that the City

22  had a custom or policy; (3) that the City's custom or policy amounts to deliberate

1  indifference to his constitutional rights; and (4) that the custom or policy was the moving

2  force behind the violation of his constitutional rights.  *See id.* (internal citations omitted);

3  *accord Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1185-86, 1193-94 (9th Cir. 2002)

4  (citing *Monell*, 436 U.S. at 694).

5       "Like individual state officials, municipalities are only liable under Section 1983 if

6  there is, at minimum, an underlying constitutional tort."  *Johnson v. City of Seattle*, 474

7  F.3d 634, 638-39 (9th Cir. 2007).  Because, as discussed above, Mr. Fuller is unable to

8  substantiate his claims for retaliatory prosecution and violations of due process, Mr.

9  Fuller's *Monell* claims against the City based on those alleged constitutional violations

10  necessarily fail.  *Id.*

11  **E.    Malicious Prosecution**

12       Mr. Fuller brings his claim for malicious prosecution under Washington state law.

13  (*See generally* Compl.; Resp.)  Under Washington state law, a plaintiff bringing a

14  malicious prosecution claim must prove the following elements:  "(1) that the prosecution

15  claimed to have been malicious was instituted or continued by the defendant; (2) that

16  there was want of probable cause for the institution or continuation of the prosecution; (3)

17  that the proceedings were instituted or continued through malice; (4) that the proceedings

18  terminated on the merits in favor of the plaintiff, or were abandoned; and (5) that the

19  plaintiff suffered injury or damage as a result of the prosecution."  *Clark v. Baines*, 84

20  P.3d 245, 248 (Wash. 2004).  Mr. Fuller's malicious prosecution claim fails because he is

21  unable to show the second element:  a want of probable cause to institute the prosecution.

22

1    The analysis of the *Hanson* and *Peasely* presumptions set forth in Section III.B

2    applies in full force to the probable cause requirement of Mr. Fuller's state law malicious

3    prosecution claim.  Additionally, in Washington, "[p]robable cause exists where the facts

4    and circumstances within the arresting officer's [or prosecutor's] knowledge and of which

5    he has reasonably trustworthy information are sufficient in themselves to warrant a *man*

6    *of reasonable caution* in a belief that an offense has been . . . committed.  *Bender v. City*

7    *of Seattle*, 664 P.2d 492, 502 (Wash. 1983).  Leaving aside the *Hanson* and *Peasely*

8    presumptions, the facts and circumstances of which Mr. Mayo had reasonably

9    trustworthy information—namely, the descriptions contained in the police reports and

10   Officer Willoughby's interview—are sufficient to warrant a person of reasonable caution

11   in the belief that Mr. Fuller had committed obstruction under RCW 9A.76.020 and

12   assault under SMC 12A.06.010.  (*See* Police Rep. at 41, 42, 44); *see also Bender*, 775

13   P.2d at 502; *Rodriguez v. City of Moses Lake*, 243 P.3d 552, 555 (Wash. Ct. App. 2010)

14   (granting summary judgment on malicious prosecution claim in favor of defendant

15   because "the [conflicting] evidence warranted a person of reasonable caution to believe

16   an offense had been committed").  Mr. Fuller does not raise a question of fact to the

17   contrary.  As such, summary judgment on Mr. Fuller's state law claim for malicious

18   prosecution is appropriate.

19   **F.      Intentional Infliction of Emotional Distress**

20   To prevail on a claim for intentional infliction of emotional distress, a plaintiff

21   must show (1) extreme and outrageous conduct, (2) intentional or reckless infliction of

22   emotional distress, and (3) an actual result of severe emotional distress.  *Kloepfel v.*

1   *Bokor*, 66 P.3d 630, 632 (Wash. 2003).  Any claim for intentional infliction of emotional

2   distress must be predicated on behavior "so outrageous in character, and so extreme in

3   degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious,

4   and utterly intolerable in a civilized community."  *Id.*  For example, extreme and

5   outrageous behavior occurs when a man under threatens to kill his former girlfriend,

6   threatens to kill the man she is dating, watches her house, calls her home 640 times, calls

7   her work 100 times, and calls the homes of men she knows numerous times, forcing her

8   to spend weekends away from home to avoid him.  *See Kloepfel*, 66 P.3d at 632.  On the

9   other hand, abducting a pet cat from a front porch and killing it by setting it on fire with

10  gasoline, while "deplorable," does not rise to level of "necessary severity" that defines

11  extreme and outrageous behavior.  *See Womack v. Von Rardon,* 135 P.3d 542, 261

12  (2006).

13       The elements of outrage generally are factual questions for the jury.  *Sutton v.*

14  *Tacoma Sch. Dist. No. 10*, 324 P.3d 763, 769 (Wash. Ct. App. 2014).  However, a trial

15  court faced with a summary judgment motion must "make an initial determination as to

16  whether the conduct may reasonably be regarded as so 'extreme and outrageous' as to

17  warrant a factual determination by the jury." *Id.* (citing *Doe v. Corp. of the President of*

18  *the Church of Jesus Christ of Latter-Day Saints,* 167 P.3d 1193, 1204 (Wash. Ct. App.

19  2007)).

20       Here, even viewing all facts and inferences in the light most favorable to Mr.

21  Fuller, a reasonable jury could not find that Ms. Lee's or Ms. Olson's actions constitute

22  "extreme and outrageous conduct."  Mr. Fuller argues that instituting criminal charges in

1 retaliation for an OPA complaint could be considered extreme and outrageous conduct.

2 (Resp. at 18.)  He emphasizes that City Attorney Peter Holmes, who instructed his office

3 to move to vacate the conviction, agrees that retaliation would be improper.  (*See* Resp.

4 (citing Stockmeyer Decl. Ex. 3 ("Holmes Dep.") at 5:8-22); *see also* Holmes Release.)

5 However, there is simply no evidence of any such retaliation in this case.  Although a

6 jury is permitted to draw reasonable inferences, it may not resort to speculation.  *See*

7 *British Airways Bd.*, 585 F.2d at 952.

8        The record shows that Sgt. Lee contacted the City Attorney's Office for

9 information relevant to her investigation of Mr. Fuller's complaint.  (*See* Lee Dep. 50:1-

10 58-22; Lee Ethics Interview 54, 58; Follow Up Form.)  There is no indication of any

11 retaliatory motive, no indication that Sgt. Lee contacted the City Attorney's Office for the

12 purpose of arguing in favor of criminal charges, and no indication that Sgt. Lee urged Mr.

13 Mayo to institute criminal charges against Mr. Fuller.  (*See id.* 17:18-23:6, 58:2-11;

14 Mayo Dep. 45:4-13.)  Although the fact that she voiced her disagreement with the

15 probable cause assessment led Mr. Mayo to reconsider the case, he only filed charges

16 after independently reviewing the police reports and interviewing the injured officer.

17 (*See* Mayo Dep. 42:9-14, 42:20-43:5; 42:9-14; 75:22-76:14; 74:4-21.)  Moreover, even if

18 Sgt. Lee had urged for the institution of criminal charges, as discussed in Section III.B,

19 probable cause for filing both the assault and obstruction charge was well-established,

20 and the City acted well within its rights in bringing charges.  Although the City has since

21 implemented a policy that discourages contact between OPA investigators and

22 prosecutors in order to avoid the appearance of conflicts of interest, that policy was not in

1    place at the time of Sgt. Lee's conduct.  (*See* Cert.)  Faced with these facts, no reasonable

2    jury could find that Sgt. Lee's behavior went "beyond all possible bounds of decency,

3    and [should] be regarded as atrocious, and utterly intolerable in a civilized community."

4    *Kloepfel*, 66 P.3d at 632.

5         The same is true for Ms. Olson's behavior.[8]  It is undisputed that she had no

6    personal involvement with the investigation of Mr. Fuller's complaint.  (Olson Decl. ¶ 4.)

7    Her review of the completed investigation file revealed only that Sgt. Lee had contacted

8    the prosecutor with questions, the two had discussed probable cause, and the prosecutor

9    had agreed to reconsider the charging decision.  (Follow Up Form.)  There was no

10   indication of bad faith, improper influence, or a conflict of interest.  (Olson Decl. ¶ 4.)

11   Ms. Olson's response to the interaction was to discuss the situation with the OPA Auditor

12   and to issue a memo advising OPA investigators to avoid conflicts of interest by reducing

13   any questions for prosecutors to writing and obtaining approval from the OPA chain of

14   command before submitting those questions to the prosecutors.  (Cert.)  No reasonable

15   jury could find that Ms. Olson's actions go "beyond all possible bounds of decency, and

16   [are] regarded as atrocious, and utterly intolerable in a civilized community."  *See*

17   *Kloepfel*, 66 P.3d at 632.  As such, summary judgment in favor of Defendants on this

18

19        [8] The section of Mr. Fuller's complaint that sets forth his claim for intentional infliction of
     emotional distress does not include any allegations regarding Ms. Olson.  (*See* Compl. ¶¶ 70-76.)  As

20   such, the court agrees with Defendants that Mr. Fuller has not adequately stated a claim for intentional
     infliction of emotional distress against Ms. Olson.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)
     (holding that to survive a motion to dismiss, a complaint must plead "factual content that allows the court

21   to draw the reasonable inference that the defendant is liable for the misconduct alleged").  Nonetheless,
     out of an abundance of caution, the court addresses Mr. Fuller's summary judgment arguments regarding

22   Ms. Olson on their merits.

ORDER- 25

1    claim is appropriate.  *See Sutton*, 324 P.3d at 769; *Nissan Fire*, 210 F.3d at 1106; *Strong*

2    *v. Terrell*, 195 P.3d 977, 982 (Wash. Ct. App. 2008) (granting summary judgment

3    because "viewing the evidence in the light most favorable to [the plaintiff], no reasonable

4    person could conclude that [the defendant's verbal abuse] was so outrageous in character,

5    and so extreme in degree, as to go beyond all possible bounds of decency").

6    **G.    Negligence**

7    A threshold negligence determination is whether a duty of care is owed to the

8    plaintiff.  *Cummins v. Lewis Cnty.*, 133 P.3d 458, 461 (Wash. 2006).  "Because

9    governments, unlike private persons, are tasked with duties that are not legal duties

10   within the meaning of tort law, [courts must] carefully analyze the threshold element of

11   duty in negligence claims against governmental entities."  *Washburn v. City of Fed. Way*,

12   310 P.3d 1275, 1287 (Wash. 2013) (citing *Osborn v. Mason Cnty.*, 134 P.3d 197, 202

13   (Wash. 2006)).  Accordingly, in negligence actions against government entities,

14   Washington courts follow the public duty doctrine.  *See Cummins*, 133 P.3d at 461.

15   Under the public duty doctrine, "no liability may be imposed for a public official's

16   negligent conduct unless it is shown that the duty breached was owed to the injured

17   person as an individual and was not merely the breach of an obligation owed to the public

18   in general."  *Id.*

19   As applicable here, the public duty doctrine means that the City cannot be liable

20   merely for allegedly breaching its general responsibilities to supervise law enforcement

21   officers or investigate citizen complaints.  *See Osborn*, 134 P.3d at 203 ("[A] broad

22   general responsibility to the public at large rather than to individual members of the

1  public simply does not create a duty of care.") (quoting *Campbell v. City of Bellevue*, 530

2  P.2d 234, 238-39 (Wash. 1975)); *see also Shope v. City of Lynnwood*, No. C10-0256RSL,

3  2011 WL 1154447, at *6 (W.D. Wash. Mar. 28, 2011) ("The duty of the City to hire,

4  train, retain, and supervise its officers is owed to the public at large, not to plaintiff

5  individually."); *Dowell v. City of Lynnwood*, No. C06-1240-JCC, 2007 WL 4365793, at

6  *6 (W.D. Wash. Dec. 11, 2007) (holding that the public duty doctrine foreclosed a claim

7  against the City for negligent hiring, training, supervision, and retention of two police

8  officers).

9       There are, however, four "exceptions" to the public duty doctrine under which a

10  government official can be found to owe a duty to an individual plaintiff:  "(1) legislative

11  intent, (2) failure to enforce, (3) the rescue doctrine, [or] (4) a special relationship."

12  *Cummins*, 133 P.3d at 461; *see also Osborn*, 134 P.3d at 202.  Mr. Fuller relies on the

13  special relationship exception.  The special relationship exception allows tort actions for

14  negligent performance of public duties if the plaintiff can prove circumstances setting his

15  or her relationship with the government apart from that of the general public.  *Taylor v.*

16  *Stevens Cnty.*, 759 P.2d 447, 451 (Wash. 1988).  A special relationship arises between the

17  plaintiff and a government entity when "(1) there is a direct contact or privity between

18  the public official and the injured plaintiff which sets the latter apart from the general

19  public, and (2) there are express assurances given by a public official, which (3) gives

20  rise to justifiable reliance on the part of the plaintiff."  *Cummins*, 133 P.3d at 462; *see*

21  *also Taylor*, 759 P.2d at 451.  Whether a municipal officer owed an actionable duty to a

22

1   plaintiff is a question of law for the court to decide.  *Munich v. Skagit Emergency*

2   *Commc'n Ctr.*, 288 P.3d 328, 332 (Wash. 2012).

3          Mr. Fuller raises multiple theories as to why the special relationship exception

4   applies to his case.  None of these theories are persuasive.  First, Mr. Fuller's assertion

5   that a special relationship is automatically formed between OPA and all citizens who file

6   a "serious" complaint is not well-taken.  (*See* Resp. at 17.)  Washington courts have made

7   clear that the mere fact that only a subset of the general public avails itself of a

8   government function does not necessarily create a special relationship between the

9   government and that subset.  *See, e.g.*, *Cummins*, 133 P.3d at 462-63 (holding that a

10  special relationship does not automatically apply to every person who dials 911 in an

11  emergency).  Rather, Washington courts have required direct communication and

12  affirmative promises by a government agent in order to establish a special relationship.

13  *See id.*; *Beal for Martinez v. City of Seattle*, 954 P.2d 237, 245 (Wash. 1998) (finding a

14  special relationship where the 911 operator made explicit assurances of protection);

15  *Torres v. City of Anacortes*, 981 P.2d 891, 898 (Wash. Ct. App. 1999) (finding a special

16  relationship where a police officer made an explicit representation that he would refer

17  plaintiff's case for a charging decision).

18         Second, Mr. Fuller's contention that the OPA form letter and brochure he received

19  in the mail create a special relationship is misguided.  The letter and brochure do not

20  constitute "direct contact" with a relevant public official—neither Sgt. Lee nor Ms. Olson

21  mailed the letter, yet they are the public officials that Mr. Fuller alleges breached a duty

22  to him.  (*See generally* Compl.); *see also Cummins*, 133 P.3d at 462; *Gunderson v. City*

ORDER- 28

1  *of Millwood*, 165 Wash. App. 1013, at *4 (2011) (requiring "direct verbal contact" to

2  establish privity).

3       Additionally, the letter and brochure neither set Mr. Fuller "apart from the general

4  public" nor provide the requisite "express assurances." *See Cummins*, 133 P.3d at 462.

5  In *Brooks v. City of Seattle*, fire department personnel at the scene of a fire handed a

6  homeowner a brochure titled "After the Fire is Out." *Brooks v. City of Seattle*, 112 Wash.

7  App. 1055, at *2 (2002).  The Washington Court of Appeals held that the brochure did

8  not create a special relationship because "[t]he brochure makes no representations about

9  [the plaintiff's] situation, but rather is a handout plainly designed for general use, which

10  cannot fairly be said to make express assurances." *Id.*  Similarly, the brochure Mr. Fuller

11  received, which is titled "How Concerns about Police Misconduct are Resolved," merely

12  explains OPA's general process and policies regarding the investigation of citizen

13  complaints.  (*See* OPA Brochure).  In fact, a brochure with the same title and similar

14  substantive information is currently available to the general public on OPA's website,

15  along with several other OPA publications.  *See Office of Professional Accountability*

16  *Publications*, Office of Professional Accountability, http://www.seattle.gov/opa/opa-

17  publications (last visited November 14, 2014).  As in *Brooks*, the OPA brochure makes

18  no representations about Mr. Fuller's specific situation, but rather is a handout designed

19  for general use.  *See Brooks*, 112 Wash. App. 1055, at *2.  As such, it does not create a

20  special relationship between Mr. Fuller and any OPA official.

21       Finally, Mr. Fuller's reliance on his telephone conversation with Sgt. Lee is

22  misplaced.  As a preliminary matter, what transpired during the conversation is unclear.

1    Sgt. Lee denies that she made any express assurances to Mr. Fuller.  (*See* Mot. at 20.)

2    She testifies that she only discussed procedure and logistics with Mr. Fuller.  (*See* Lee

3    Dep. at 46:12-47:9; Follow Up Form (corroborating Sgt. Lee's deposition testimony).)

4         When asked at deposition what Sgt. Lee discussed with him, Mr. Fuller

5    responded:

6         Well, it could have been the, you know, what had Moss[9]—had told me, you
         know.  I guess she was giving me that little song and dance that, you know,
7         she was there to be helpful to me and, you know, just giving me the line
         that she's there to help me out, I think.   And the reason why I say it
8         thataway is because I just kind of had felt that, you know, then something
         was, you know, something wasn't right.

9    (Fuller Dep. at 84:4-13.)  Mr. Fuller did not recall any other details that Sgt. Lee provided

10   him.  (*See id.* at 84:14-17.)  He did not, however, believe that Sgt. Lee had promised him

11   a result from his investigation.  (*See id.* at 84:18-22.)

12        Nevertheless, Mr. Fuller now provides a declaration claiming:  "I spoke on the

13   phone with OPA investigator Caryn Lee, and she told me she would fairly handle the

14   investigation, and I could count on her to present my complaints and information fairly,

15   and help get a just result for my complaint . . . ."  (Fuller Decl. ¶ 9.)  Because the issue

16   arises in the context of Defendants' motion for summary judgment, the court will fully

17   credit Mr. Fuller's evidence of the conversation.  *See Reeves*, 530 U.S. at 150 ("[T]he

18   //

19

20   _____

21        [9] Acting Sergeant Scott Moss was one of the first officers Mr. Fuller spoke to regarding his OPA
     complaint.  (*See* Follow Up Form.)  The record before the court shows only that Sgt. Moss and Mr. Fuller
     discussed the possibility of obtaining a videotape of Mr. Fuller's arrest.  (*See id.*)  It is undetermined what
22   else they may have discussed.

1  court must draw all reasonable inferences in favor of the nonmoving party, and it may not

2  make credibility determinations or weigh the evidence.")

3       Yet, even crediting Mr. Fuller's account, Sgt. Lee's alleged statements do not rise

4  to the level of "express assurances" necessary to create a duty of care to Mr. Fuller.  It is

5  true that promises of action can constitute the requisite express assurances.  *See Munich*,

6  288 P.3d at 335.  Such promises, however, must indicate that the public official will "act

7  in a specific manner."  *See Babcock v. Mason Cnty. Fire Dist. No. 6*, 30 P.3d 1261, 1270

8  (Wash. 2001).  "A duty cannot arise from implied assurances."  *Id.*; *see also Cummins*,

9  133 P.3d at 463.  Rather, the plaintiff "must seek an express assurance and the

10 government must unequivocally give that assurance."  *See Babock*, 30 P.3d at 1270.

11      Accordingly, the Washington Supreme Court held that a firefighter's reassurance

12 to homeowners that the fire department "would take care of protecting [their] property"

13 did not create a duty to rescue the homeowner's property, even though the firefighter had

14 previously ordered the homeowners not to rescue items from their burning home.  *Id.* at

15 1270.  The Court found that the homeowner did not specifically seek any assurance from

16 the firefighter and that, unlike "the detailed express assurances" given in other cases

17 where a special relationship was found, "the statement made by the firefighter in this case

18 did not indicate she or the other firefighters would act in a specific manner."  *Id.*

19      Similarly, the Washington Court of Appeals held that a 911 operator's statement

20 to a husband reporting his missing wife that "if something had gone wrong, that they

21 would locate [his wife] and find out what happened" was not an express assurance

22 because the husband "neither sought not received express assurances of specific

ORDER- 31

1   conduct." *Rider v. King Cnty.*, 176 Wash. App. 1029, at *4 (Wash. Ct. App. 2013).  In

2   contrast, when a plaintiff has dialed 911 in an emergency, "the express assurance element

3   is satisfied when the operator assures the caller law enforcement officers are on their way

4   or will be sent to the caller's location."  *Munich*, 288 P.3d at 335 (citing *Beal for*

5   *Martinez*, 954 P.2d at 245 (finding an express assurance where the 911 operator stated,

6   "We'll get the police over there for you.") and *Chambers-Castanes v. King Cnty.*, 669

7   P.2d 451, 454-55 (Wash. 1983) (finding an express assurance where the operator said,

8   "We have the officers on their way out there right now.")).

9          The court finds that Mr. Fuller's case is more analogous to *Babcock* and *Rider*

10  than to *Munich*.  To begin, Mr. Fuller puts forth no evidence that he specifically sought

11  assurances from Sgt. Lee.  *See Babock*, 30 P.3d at 1270.  Because Mr. Fuller fails to raise

12  a question of fact, that element is unmet.

13         Moreover, Sgt. Lee's putative statement that "she would fairly handle the

14  investigation, and [Mr. Fuller] could count on her to present [his] complaints and

15  information fairly, and help get a just result for [his] complaint" is not the type of

16  "detailed" promise of "specific" conduct necessary to justify imposing a legal duty of

17  care on the City.  *See id*.  Like the firefighter in *Babcock* ("We'll take care of protecting

18  your property") and the 911 operator in *Rider* ("If something has gone wrong, we'll find

19  your wife"), Sgt. Lee merely repeated a general responsibility that the City owes to every

20  member of the public:  in this case, to investigate citizen complaints fairly.  She did not,

21  however, promise any specific steps she would perform in undertaking that duty.  *See*

22  *Munich*, 288 P.3d at 331 ("Ok, all righty, there's already a deputy that's en route to you,

ORDER- 32

1   ok?") *and Chambers-Castanes*, 669 P.2d at 454-55 ("We have the officers on their way

2   out there right now.").

3        It is not enough for Mr. Fuller to argue that he assumed a "fair" investigation

4   necessarily would not influence a concurrent criminal case.  No matter how reasonable

5   Mr. Fuller's assumption, a government duty cannot arise from implied or inherent

6   assurances.  *See Babcock*, 30 P.3d at 1270; *Cummins*, 133 P.3d at 463("Mrs. Cummins

7   does not contend that the 911 operator unequivocally gave Mr. Cummins an express

8   promise that medical assistance would be dispatched.  Under Washington case law, this

9   absence of an express assurance to dispatch assistance by the operator precludes this

10  court from finding as a matter of law that Mrs. Cummins has established an actionable

11  duty against the county."); *see also Vergeson v. Kitsap Cnty.*,  186 P.3d 1140, 1148

12  (Wash. Ct. App. 2008) (finding no government duty because the plaintiff "fail[ed] to

13  identify any express assurances that she sought or received from the County" and "[n]o

14  matter how reasonable, [the plaintiff's] unspoken expectation that her quashed warrant

15  would be removed from the databases does not qualify as an express assurance for

16  purposes of establishing this special relationship exception . . . .").  As such, Sgt. Lee's

17  conversation with Mr. Fuller does not create a special relationship.

18       The public duty doctrine is a "focusing tool" employed to determine that the duty

19  alleged is actually owed to the individual claimant rather than the "nebulous public" at

20  large.  *Osborn*, 134 P.3d at 202; *see also Washburn*, 310 P.3d at 1287.  Mr. Fuller fails to

21  show that his negligence claim is predicated on a duty the City owed to him specifically,

22  rather than the general public.  Because the City did not owe Mr. Fuller a legally

1 | actionable duty, summary judgment on Mr. Fuller's negligence claim is appropriate.  *See*

2 | *Munich*, 288 P.3d at 332.

### IV.    CONCLUSION

4 |        For the foregoing reasons, the court GRANTS Defendants' motion for summary

5 | judgment (Dkt. # 37).

6 |        Dated this 9th day of December, 2014.

_____
JAMES L. ROBART
United States District Judge

ORDER- 34